**REDBUD COOPERATIVE CORPORA-TION, Dick L. Lansden and wife, Martha S. Lansden, Individually and on behalf of all others similarly situated, Plaintiffs/Appellees,**

v.

**Creason CLAYTON, Gania Rose Clayton and Creason Clayton Construction Company, Inc., Defendants/Appellants,**

**The Metropolitan Government of Nashville and Davidson County, Tennessee, Defendant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Aug. 1, 1985.

Permission to Appeal Denied by Supreme Court Nov. 18, 1985.

Thomas T. Pennington & Raymond D. Lackey, Denney, Lackey & Chernau, W.A. Moody, Moody & Moody, Nashville, for defendants/appellants.

W. Ovid Collins, Jr. & W. Gregory Miller, Cornelius & Collins, Nashville, for plaintiffs/appellees.

## OPINION

KOCH, Judge.

This appeal arises from a dispute between the developer of a planned unit development located in an affluent section of Nashville and the development's homeowners. In 1979, the non-profit corporation consisting of the development's homeowners together with several individual owners brought an action in the Chancery Court for Davidson County against the developer and the Metropolitan Government of Nashville and Davidson County claiming that the development was being damaged by an inadequate surface water drainage system. The trial court heard this case without a jury and on May 18, 1984, entered a judgment against the developers in the amount of $157,389.85.[1] The developers have duly perfected this appeal. For the reasons stated herein, we affirm the judgment of the trial court.

### I.

### *The Facts*

Creason Clayton, his wife, and their construction company are the developers and builders of Redbud, a planned residential development located in the Green Hills Section of West Nashville. This development, consisting of twenty-one separate parcels and adjoining common areas, was built on a sloping 5.27 acre tract bordered by Hobbs Road on the north and by other residential property on the other sides. Because of the terrain in this area, the surface water from approximately ten acres of neighboring residential property flows in a northwesterly direction onto the property where Redbud is located.

The Claytons began to develop this property in early 1974. They retained a landscape architecture and engineering firm to

1. The plaintiffs sought only injunctive relief against the City. The trial court denied this relief and dismissed the complaint as to the City. Neither party to this appeal takes issue with this decision.

prepare a master development plan for the site and to obtain the required approvals from the local governmental agencies. The developers' engineers prepared a preliminary master development plan for Redbud which included the proposed preliminary grading plan that was required by the local zoning ordinance.[2] The Metropolitan Planning Commission approved these plans on February 20, 1974. This preliminary plan was ultimately approved on June 4, 1974, when an ordinance amending the local zoning regulations was passed by the Metropolitan Council and approved by the Mayor.

In order to obtain building permits for the construction of the homes to be built in Redbud, the developers were required to submit a final master development plan to the Metropolitan Planning Commission for review and approval. In addition to the information provided in the proposed master development plan, the local zoning ordinance required that this plan also contain "the location and size of water, sewerage, and drainage structures" and "detail grading plans showing existing and proposed topography." Thus, in accordance with the local ordinance, the developers' landscape architect filed a detailed "grading plan" dated July 3, 1974, with the Metropolitan Planning Commission and with the Division of Public Works.

The developers' grading plan showed Redbud's existing topography as well as its proposed topography. It revealed that the developers intended to make provisions for the drainage of the surface water by constructing sodded swales[3] on portions of Redbud's eastern boundary, on its southwestern boundary, and along its entire western boundary. As originally designed, these swales would run through the middle of the residents' relatively small backyards. The grading plan also called for the construction of an underground drainage system in the form of a conduit and three thirty-inch catch basins running in a generally northerly direction through the middle of Redbud. The purpose of this underground conduit was to carry off to Hobbs Road the surface water collected by the swale that was to be constructed on the southeastern portion of the development as well as other surface water that would be expected to accumulate on the upper portions of the development and then flow downhill in a northwesterly direction across other portions of the development.

The grading plan, as submitted, did not envision the construction of a perimeter wall around the entire development.[4] Nor did it envision the construction of protective or privacy walls between the backyard of each parcel. Nor did it envision the construction of patios in the homeowner's backyards. The grading plan, as filed, was ultimately approved by the Metropolitan Planning Commission, and the developers were issued building permits in accordance therewith.

The developers began to grade and to prepare the site for the construction of the homes. However, as they proceeded to construct Redbud, the developers decided to depart from the approved grading and drainage plan on file with the Planning Commission in a number of significant respects.

The first departure relates to the underground drainage conduit that was originally planned to run in a northerly direction through the middle of the development.

---

**2.** Code of the Metropolitan Government of Nashville and Davidson County, Tennessee, Section 43–2–16.1 *et seq.* pertaining to "planned residential districts" was passed over the Mayor's veto on July 3, 1973.

**3.** A "swale" is a man-made, grass covered depression designed and used for carrying surface water from a higher point to a lower point. Various witnesses in this case used this term interchangeably with "ditch". The distinction, if any, between the two structures relates to the

slope of their sides. The pitch of the sides of a swale would be more gradual than those of a ditch.

**4.** Both Redbud's promotional literature and the restrictive covenants filed on August 22, 1974, indicated that the developer was obligated to construct a masonry and wrought iron fence along the entrance to the project. This fence was, in fact, constructed; however, it plays no role in this case.

The Nashville Electric Service installed its primary and secondary underground cables for the development before this conduit was constructed. Once these cables were in place, the developers discovered that they could not construct their underground drainage conduit as originally planned because it would interfere with the underground electric cables. Rather than constructing an alternate underground drainage system that would carry off the surface water to Hobbs Road, the developers decided to abandon constructing two of the three catch basins and the portions of the conduit that would have caught and carried off the surface water collecting upon the upper most portions of the development.[5] The developers did, however, construct one catch basin in front of their own home which was connected to the portion of conduit that was originally intended to carry off the water to Hobbs Road.

The second departure from the grading and drainage plan was the construction of a masonry wall around the entire perimeter of Redbud. The developers did not intend originally to construct this wall. However, during the early phases of construction, and in response to individual requests by persons who had purchased homes in Redbud, the developer decided to build this wall primarily to provide the property owners with additional privacy.[6] The developers began to build this wall in late 1974. It was built in increments as the home on each parcel was constructed and it was completed in late 1976. The wall was constructed of concrete blocks and was not reinforced. The developers included weep holes at the base of this wall for the pur-

pose of permitting water to flow through freely at these points.

The third departure from the grading and drainage plan was the construction of similar sideline privacy walls between the backyards of each parcel. These walls were not originally planned but were erected by the developer as the construction progressed in response to the requests of individual purchasers.

The fourth departure related to the construction of the swales which, as originally planned, would run through the backyards of a majority of the homes in Redbud. While the homeowners never told them collectively not to construct these swales, the developers decided not to construct the swales when individual purchasers told them they would prefer to have their yards drain gradually away from the house and patio toward the perimeter privacy wall.[7] The developers also claimed that they built a ditch around the outside of the perimeter wall which served essentially the same purpose of these swales.

Various residents of Redbud began to experience problems resulting from surface water within a relatively short period of time after they moved in.

The owners of the parcel at the southernmost end of the development became aware of the problems caused by the surface water soon after they moved into their home in June, 1976. These problems included: a constantly damp crawl space underneath the house that was causing doors and windows to warp; the erosion of their backyard caused by water streaming through the weep holes of the perimeter wall during and after a rain;[8] a large stream of water

5. Later, in 1976, the developer attempted to replace this underground conduit with a twelve inch corrugated metal pipe buried just at the surface of the ground that ran from an opening behind the perimeter wall on the southeastern boundary of the development and emptied directly into Redbud drive, the private street that provided the only means of ingress and egress to the development.

6. Mr. Clayton testified that he did not "see how walls would have anything to do with the drainage purposes." He stated "Well, they're primarily privacy walls, but I'm sure they would have

some effect of deterring water from coming into the subdivision. They're not intended to withstand a great pressure of water."

7. Mr. Clayton testified: "It was no way to do a swale that I know of and give them [the purchasers] what they wanted."

8. The developers eventually plugged up these weep holes in response to the homeowners' complaints. After the holes were filled, however, the homeowners testified that when it rained, water would sometimes accumulate to a

running east to west through their backyard from underneath the perimeter wall during and after a rain; and frequent ponding of water in the parking area in front of their home.[9]

Another property owner whose home is on the northwestern end of the development testified that when it rained, the water would come through the weep holes in the perimeter wall like a "geyser." He stated that the force of the water was so strong that he was required to build a brick drain in his backyard to divert the water to his driveway. He stated that when it rains, there is a "real freshet" down his driveway that floods the street in front of his home.

Another property owner living in the center of the development near where an originally planned catch basin was to have been built testified that during cold weather she had as much as three inches of ice in front of her house and driveway making the road impassable for days at a time. At other times, she testified that she was required to walk through ankle deep water when going to and from her home.

The water that consistently accumulated in the cul-de-sac at the center of Redbud was part of the complaints of all property owners who testified. The presence of the water stemmed from a number of causes: first, the rain that naturally fell on the area; second, the water that was carried on to Redbud Drive by the twelve inch pipe running from outside the southeastern portion of the perimeter wall; and third, the water from a positive drain pipe from the basement of a neighboring house that emptied into Redbud Drive near the place where the twelve inch pipe emptied its water into the road.[10]

In December, 1978, a portion of the perimeter wall in the vicinity of the southern opening of the twelve inch pipe collapsed after a heavy rain because of the weight of the water against it. The developer did not repair this wall; it was repaired by the homeowners themselves. The developers testified at the trial that the wall had collapsed because the opening of the twelve inch pipe that was intended to carry off the ground water accumulating behind the wall had been plugged up. The plaintiffs' engineer testified that it collapsed because of faulty construction.

## II.

### The Class Action Issue

■ The developers first insist that the trial court committed reversible error by allowing this case to be tried as a class action when the plaintiffs never attempted to certify it as a class action. It was unnecessary for them to do so because the Redbud Cooperative Corporation was also a plaintiff. Under the facts of this case, this corporation had the capacity to represent not only its own proprietary interests in the development's common areas but also to represent the collective interests of the persons who owned homes in Redbud.

The Redbud Cooperative Corporation was incorporated by the developers in 1974 as a corporation not for profit as a homeowners association whose membership includes all of Redbud's homeowners. It is an integral part of the Redbud development because it owns the development's common areas. Its purpose is to provide for the maintenance, preservation, development, and control of the development's

---

depth of one and a half feet behind the perimeter wall in their back yard.

9. The homeowners testified that this ponded water would become ice during cold weather and would breed mosquitoes during the summer.

10. At some point after construction of Redbud commenced, the developer decided to install a positive drain in the crawl space of lot number six to carry off water from a wet weather spring located beneath the house. While it is not clear whether the developers were aware of this spring prior to beginning construction, it is evident that they determined that it would be appropriate to permit the water from this spring to consistently run into Redbud Drive. It appears that the drainage plan as originally designed would have eliminated much of this problem. At trial, the developers proposed various other ways to remedy the problem their present drainage solution was creating.

common areas for the use and benefit of the development's homeowners. To this end, its charter specifically gives the corporation the authority to

> Represent and promote the welfare of the owners and residents of the lots and houses located within the Redbud Development, and to have and exercise all rights, powers, and privileges of a Corporation not for profit organized under the Tennessee General Corporation Act may now or hereafter have or exercise.[11]

In specific regard to the streets located within the development, the restrictive covenants prepared by the developers provide:

> Ingress and egress, to and from all lots shall be provided from Hobbs Road for both vehicles and pedestrian traffic, and areas designed for such ingress and egress shall be maintained for the orderly flow of all such traffic.

These restrictive covenants also state:

> In the event of any violation or threatened violation of any of these restrictive covenants, the right is reserved by any lot owners and to the Redbud Corporation to enjoin the same or to recover damages therefor, or both.

Thus, by operation of the Tennessee General Corporation Act and the powers specifically conferred upon the corporation by the developers, the Redbud Cooperative Corporation has the authority to bring an action in its own name to protect the interests of the persons who owned property in Redbud and to protect these owners' interests in the development's streets and other common areas.

Redbud's residents properly and purposefully decided to use the corporation to represent their interests in this case. They met on July 9, 1979, and requested their attorney to notify the developers that they "want[ed] the entire drainage system on the property corrected in such a manner as to provide proper drainage satisfactory to

the Board of Redbud and to correct and rebuild the walls." In the event that an adequate response was not forthcoming, the residents directed "that suit be filed on behalf of Redbud Cooperative against Creason Clayton of Metro Nashville, and Creason Clayton Construction Company."

This action was filed approximately one month later. The plaintiffs[12] alleged in their complaint that the developers had a duty to construct a drainage system that would be adequate to carry off surface water so that the houses and property in Redbud would not be damaged. They also alleged that the developers had "wholly and completely failed" to provide such a drainage system and, in fact, had made the development's drainage problems worse by constructing a perimeter wall that did not comply with the drainage and grading plan that had been approved by the Metropolitan Planning Commission. Thus, the residents claimed that they "will sustain continuing irreparable damage each and every time it rains" as a result of the developers' actions.

Permitting the Redbud Cooperative Corporation to maintain this action in its own name on behalf of its members is also in harmony with the rule that:

> an association has standing to bring suit solely in its own name on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Curve Elementary School Parent and Teacher's Organization v. Lauderdale County School Board*, 608 S.W.2d 855, 858 (Tenn.App.1980).

See also 6 P. Rohan, *Real Estate Transactions*, Section 10.04 (1985); *Andrikopoulos v. Broadmoor Management Co.*, 670 P.2d

---

11. Tenn.Code Ann. Section 48–1–402(2) applies to corporations not for profit and provides that a corporation shall have the power "[t]o sue and be sued, complain and defend, in its corporate name."

12. Two property owners joined in this action with the corporation as individual plaintiffs.

435, 439 (Colo.App.1983); *1000 Grandview Association, Inc. v. Mt. Washington Associates,* 290 Pa.Super. 365, 434 A.2d 796, 797–98 (1981); and *Garden District Property Owners Association v. City of New Orleans,* 98 So.2d 922, 924 (La.App.1957).

In a case strikingly similar to the one before us, the Appellate Court of Illinois has held that an association representing the homeowners in a planned unit development could represent the homeowners' collective interests in an action against the developer stemming from surface water drainage problems caused by the construction of an inadequate drainage system. Like the Redbud Cooperative Corporation, this association was organized as a corporation not for profit and held title to the development's common areas. Like the developers in the case before us, the developers had conveyed these common areas to the association to be managed for the benefit of the homeowners. Based upon allegations that the homeowners had been damaged because "the common areas have retained and held surface storm water," the Appellate Court of Illinois held:

> The Association has thereby stated under general common law principles representational standing to assert the rights of its individual members since it has alleged an immediate, direct and substantial injury to any one of them. *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.,* 118 Ill.App.3d 163, 73 Ill.Dec. 503, 507, 454 N.E.2d 363, 367 (1983).

Based upon this authority, we conclude that the plaintiffs were not required to maintain this action as a class action in order to obtain the relief sought in the complaint. Thus, the failure of the individual plaintiffs to seek class certification of their claims does not fatally infect the judgment. Redbud Cooperative Corporation was authorized and had the standing to bring this action independent of the individual plaintiffs and thus, the judgment in its favor can stand independent of the action taken on the individual plaintiffs' claims.

## III.

### *The Adequacy of the Proof*

The developers also assert that the trial court's judgment cannot stand because there is no proof that the plaintiffs have been damaged by any negligent act reasonably attributable to them. They also claim that the plaintiffs have failed to prove that there has been a breach of implied warranty.

This Court's ability to address these issues has been hampered by the failure of counsel for both parties to bring the issues in this case into proper focus. In normal circumstances, it is not our function to attempt to unravel the pleadings to ascertain the precise issues in controversy. *H.H. Luttrell and Associates v. Bank of Quitman,* 559 S.W.2d 942, 943 (Tenn.1978). Nor is it incumbent upon this Court to sift through the record to find proof that substantiates the parties' factual allegations. *Schoen v. J.C. Bradford & Company,* 642 S.W.2d 420, 427 (Tenn.App.1982). However, in the discharge of our responsibility under Tenn.R.App.P. 36(a) to grant relief based upon the law and the facts in the appellate record, we have found it necessary to scrutinize this record in light of the trial court's decision, pursuant to Tenn.R. Civ.P. 15.02, to permit the plaintiffs to conform their pleadings to the proof they had introduced.[13]

The complaint filed in this case is framed in the most general terms. Its factual allegations with regard to the developers' conduct could equally support theories of recovery based upon breach of contract, breach of implied warranty pursuant to *Dixon v. Mountain City Construction Co.,* 632 S.W.2d 538 (Tenn.1982), or negligence. Notwithstanding this generality,

---

**13.** The trial court has wide discretion in granting such amendments. *Diversified Equities, Inc. v. Warren,* 567 S.W.2d 171, 175 (Tenn.App. 1976). The developers are not asserting—and

we have no reason to determine—that permitting this amendment was an abuse of the trial court's discretion.

we note that the defendants permitted this case to go through lengthy discovery and to trial without seeking to require the plaintiffs to define their causes of action more precisely.

The case went to trial in this nebulous state. At the conclusion of the plaintiffs' proof, the trial court granted their oral motion pursuant to Tenn.R.Civ.P. 15.02 to conform their pleadings to the proof. The developers proceeded to put on their proof without seeking any further clarification of the precise nature of the plaintiffs' cause of action. At the close of all the evidence, the developers also moved to amend their pleadings "to be allowed to amend to plead all possible applicable statutes of limitation." The trial court granted this motion.[14] It was at this point, after both sides had rested, that the developers' trial counsel, for the first time, raised the issue of the adequacy of the plaintiffs' pleadings. In the discussion concerning the sequence and filing of post trial briefs, the developers' trial counsel stated:

Before I can respond I've got to know which way Mr. Higgins is going to attempt to travel, because the pleading is not with sufficient specificity to direct this down any known line of progress to get at.

The trial court proceeded to decide this case. However, even its memorandum and judgment do not state with precision upon what legal theory relief has been granted. ■ From this confusion, we can only conclude that the parties, whether purposefully or through inattentiveness permitted this case to go to trial based upon any legal theory that could be supported by the proof. Thus, after the trial court granted

the plaintiffs' Tenn.R.Civ.P. 15.02 motion, the causes of action and proof relating thereto relied upon by the plaintiffs must be treated as if they had been raised in the pleadings. *Chisholm v. Bohannon,* 558 S.W.2d 446, 448 (Tenn.App.1977). All legal theories upon which the developers could be held liable were, therefore, before the court and were tried by implied consent. *Zack Cheek Builders, Inc. v. McLeod,* 597 S.W.2d 888, 890–91 (Tenn.1980).[15]

With the record in its present state, we need only determine whether Redbud's money judgment can be sustained based upon any theory of recovery reasonably embodied in the pleadings. Thus, of necessity, our decision is limited to the facts of this case and should not be construed as defining all potential causes of action that may be asserted against developers of planned unit developments such as Redbud. If we find that the judgment can be supported based upon one theory of relief, we need not inquire into the applicability of all other possible theories. See 71 C.J.S. *Pleading* Section 521 (1951).

Based upon our examination of the precedents in this State and elsewhere, we have already determined that a developer of a planned unit development could be found liable to the development's residents for damages resulting from the construction of the development based upon, among others, the theories of breach of contract, breach of implied warranty of habitability and fitness of the common areas, and negligence. The developers have limited their appeal only to the issues of the adequacy of the plaintiffs' proof with regard to negligence and breach of warranty.[16] We con-

14. We have not been called upon to pass upon the propriety of the trial court's action in this regard. Thus, nothing in this opinion should be construed as approving the trial court's decision to permit the defendants to assert an affirmative defense for the first time after all the proof had been taken.

15. The developers' trial counsel permitted this situation to arise. Thus, the developers cannot now be permitted to take advantage of the errors that are the natural consequence of their

own conduct. *Norris v. Richards,* 193 Tenn. 450, 457–58, 246 S.W.2d 81, 84–85 (1952).

16. We note that counsel for the plaintiffs chose not to respond directly to these factual issues. When the appellant asserts that there is no evidence with regard to a particular issue, it is incumbent upon the appellee to cite those places in the record where such evidence can be found. *Zang v. Leonard,* 643 S.W.2d 657, 665 (Tenn. App.1982). For their own convenience, the appellees have chosen to respond to their own

sider only those facts which support the award of damages based upon the developers' negligence because we have determined that there is ample evidence in the record to support a judgment on this basis.[17]

■ In order to prevail under a negligence theory, a party must demonstrate: (1) that the defendant owed a legally recognized duty to the injured party; (2) that the defendant breached this duty; and (3) that the plaintiffs' injuries were the proximate and foreseeable result of the defendant's breach of duty. *Ford Motor Co. v. Eads*, 224 Tenn. 473, 483, 457 S.W.2d 28, 32 (1970); *Shouse v. Otis*, 224 Tenn. 1, 7, 448 S.W.2d 673, 676 (1969); and *Ruth v. Ruth*, 213 Tenn. 82, 86, 372 S.W.2d 285, 287 (1963).

■ All the elements of a cause of action based upon negligence are present in this case. The developers had a legally recognized duty to construct the development in strict compliance with its master development plan so as to render the dwellings and common areas habitable. This duty is imposed upon the developers not only by the local zoning ordinance but also by contract and case law.

There is clear proof that the defendants breached this duty because they did not construct Redbud in compliance with the drainage and grading plan they had prepared and filed with the City. These deviations were not minor or technical but rather amounted to a wholesale abandonment of the original drainage plan.[18]

It was reasonably foreseeable that the residents' use and enjoyment of their property and the development's common areas would be impaired if an inadequate drainage system were constructed at Redbud. The requirement that grading and drainage plans be prepared and approved prior to construction is evidence of a recognition that inadequate drainage will result in damage. Even without these requirements in the local ordinance, the developers' own engineering expert testified that

> there is certainly no standard of practice that routinely allows accumulation of storm water, surface water to collect and remain in such a place that it could freeze and cause a—an ice condition of the type I have observed in Redbud.

There is also proof that preponderates in favor of determining that the plaintiffs have been damaged and that these damages are the proximate result of the developers' failure to construct a drainage system in accordance with its original drainage plan which would have dealt with the surface water reasonably expected to flow onto Redbud. There is proof that certain owners have consistently damp crawl spaces underneath their homes that cause their doors and windows to warp. There is also proof that geysers of water stream from weep holes in the perimeter fence into the residents' backyards. There is also proof that surface water is routinely diverted onto the development's roadways causing streams and standing pools. Once on the roadways, these pools freeze into slick, icy spots in the winter and provide a breeding place for mosquitoes during the summer. The creation of these conditions on

reformulated issues. This has not assisted this Court in its deliberations on this case.

17. The proof shows that Redbud's homeowners include not only persons who purchased their homes directly from the developers but also persons who bought their homes from the original homeowners. The Tennessee Supreme Court has recognized the existence of certain implied warranties in favor of the initial purchasers of newly constructed homes. *Dixon v. Mountain City Construction Co.,* 632 S.W.2d 538 (Tenn.1982). Because we have determined that the judgment in this case can be sustained based upon the developers' negligence, we need not

determine whether the proof in this record supports a recovery based upon breach of warranty or whether these warranties extend to subsequent purchasers in light of Tenn.Code Ann. Section 29–34–104.

18. Because of the extent of the developers' failure to adhere to its grading and drainage plan, we need not address the propriety of making field changes based upon the discovery of unforeseen subsurface conditions or making minor variations from the plan which do not alter its purpose.

the development's roadways and around its perimeter walls has resulted not only in injury to Redbud's common areas but has also interfered with the homeowners use and enjoyment of their property.

## IV.

### The Measure of Damages

Finally, the developers assert that if they are indeed liable, the measure of damages should not be the cost of correcting Redbud's drainage problems but rather should be the amount that the value of the residences in Redbud have diminished as a result of the inadequate drainage system. They contend that the trial court erred by awarding damages based upon the costs of correcting the drainage problems.[19]

In the face of uncontradicted proof that certain of the homes in Redbud had been sold for more than their original purchase price during the ten years since they were originally constructed, the plaintiffs' expert appraiser testified that the value of these homes would have increased more were there no drainage problems in Redbud. He testified that these conditions would have to be disclosed to prospective purchasers and that knowledge of the drainage problems would depress the value of the homes by five to seven percent. While he stated that he was unable to testify concerning the exact dollar impact to each property in Redbud, the appraiser stated that the properties' marketability would be impaired because prospective purchasers "would be more inclined to look at other properties where the water problem did not exist."

The engineer who designed the drainage plan to remedy the development's problems also testified that his remedial plan was more elaborate than what would have been required initially. This was not because the original drainage plan would have been inadequate had it been constructed, but rather because of the extensive improvements that had already been constructed in

the development. The engineer stated that the drainage system that was originally designed could not be constructed without doing substantial damage to costly driveways, patios, and landscaping. The damage that would be caused to these improvements were the original drainage plans now followed would be far more costly than the proposed solution. Thus, the complexity of the proposed solution was due to the engineer's attempts to minimize the damage to other existing improvements in the development.

Our courts have approached the question of the measure of damages for injury to real property from several different directions. They have, in the past, drawn distinctions between damages for injuries to the land itself as opposed to improvements on the land. They have also drawn the distinction between injuries that are permanent as opposed to those that are "remediable." *Citizens Real Estate & Loan Co. v. Mountain States Development Corp.*, 633 S.W.2d 763, 766 (Tenn. App.1981), *aff'd* (Tenn.1982); *Mink v. Majors*, 39 Tenn.App. 50, 54–55, 279 S.W.2d 714, 716 (1953); and *McKinnon v. Michaud*, 37 Tenn.App. 148, 161–64, 260 S.W.2d 721, 726–28 (1953). In an attempt to reconcile these precedents, Judge Carney has stated:

> Our appellate courts have uniformly held that the measure of damages for injury to real estate is the difference between the reasonable market value of the premises immediately prior to and immediately after injury but if the reasonable cost of repairing the injury is less than the depreciation in value, the cost of repair is the lawful measure of damages. [citation omitted] Of course, the trier of fact can also take into consideration the reasonable cost of restoring the property to its former condition in arriving at the difference in value immediately before and after the injury to the premises. [citations omitted] *Fuller v.*

---

**19.** This position on appeal seems curious since at trial, the developers chose to put on proof that the drainage problems could be corrected

for a great deal less than the estimates obtained by the plaintiffs' engineering experts.

*Orkin Exterminating Co.,* 545 S.W.2d 103, 108 (Tenn.App.1975).

Of course in applying this rule, as with any other rule of damages, this Court must bear in mind that uncertain, contingent, or speculative damages should not be awarded. *Maple Manor Hotel Inc. v. Metropolitan Government of Nashville and Davidson County,* 543 S.W.2d 593, 599 (Tenn.App.1975). However, uncertain or speculative damages are prohibited only when the existence of damages is uncertain not when the amount of damage is uncertain. *Cummins v. Brodie,* 667 S.W.2d 759, 765 (Tenn.App.1983). All that an award for damages requires is proof of damages within a reasonable degree of certainty. *Wilson v. Farmers Chemical Association,* 60 Tenn.App. 102, 111, 444 S.W.2d 185, 189 (1969), and *Acuff v. Vinsant,* 59 Tenn.App. 727, 737, 443 S.W.2d 669, 674 (1969). Based upon the proof in this record, we conclude that the only reasonable basis upon which the trial court could have awarded damages was the cost of repairing Redbud's inadequate drainage system.

We reach this conclusion for three reasons. First, it would have been impractical to attempt to calculate the exact extent of damage to each home in the development with any degree of precision. In addition to the interference with the residents' use and enjoyment of their property, the plaintiffs' experts testified that the homeowners' injuries stemmed from the diminution of their property's competitive attractiveness.

The second basis for our conclusion that the trial court used the correct measure of damages stems from the proof that the inadequate drainage system is causing damage to the development's common ar-

eas, primarily the roadways. The common areas in Redbud have never been sold on the open market and will never be sold. They are intended to be held in perpetuity for the use, enjoyment, and convenience of the development's residents. Thus, any measure of damages predicated upon market value would be inapplicable as to the common areas.

The final basis for our decision is found in the developers' proof concerning the recent sales prices of several of the homes in Redbud. When this testimony is considered together with that concerning the property's diminished market value, it would have been reasonable for the trial court to conclude that the cost of repairing Redbud's drainage system was less than the diminished market value of all the homes in the development.

We thus, conclude that the trial court was justified in awarding damages based upon the estimated cost of repairing the development's drainage system.[20] This evidence can be taken into consideration in attempting to determine the difference in the property's value, *Fuller v. Orkin Exterminating Co.,* 545 S.W.2d 103, 108 (Tenn.App.1975), and *Third National Bank v. Goodlett Realty Co.,* 58 Tenn.App. 48, 425 S.W.2d 783 (1967), and in this case it was the only reliable evidence before the trial court.[21]

The judgment of the trial court is affirmed and this case is remanded for further proceedings. The costs of this appeal are taxed against the Redbud Cooperative Corporation and the Creason Clayton Construction Company in equal proportions, and their respective sureties, for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.

---

**20.** In *City of Knoxville v. Peebles,* 19 Tenn.App. 340, 87 S.W.2d 1022 (1935) this Court upheld an award based upon estimated costs of repair rather than the actual costs. Thus, the trial court in this case could base its award upon the bids received by the plaintiffs.

**21.** Basing the damages upon the cost of repairing the drainage system is the same result that

would be reached if this action had been decided upon a breach of contract or breach of implied warranty theory. *Estate of H.C. Jessee v. White,* 633 S.W.2d 767, 769 (Tenn.App.1982), and *Edenfield v. Woodlawn Manor, Inc.,* 62 Tenn.App. 280, 288–89, 462 S.W.2d 237, 241 (1970). See also 13 Am.Jur.2d *Building and Construction Contracts,* Section 79 (1964).