In re BAUM'S FLORIST, INC. d/b/a Baum's Florist and Baum's House of Flowers, Debtor.

Mary K. BOWMAN and Karl Porfirio, d/b/a Baum's Florist, Plaintiffs,

v.

BAUM'S FLORIST, INC., John D. Kreis, Trustee and Gordon F. Scott, Defendants.

John D. KREIS, Trustee, Counterplaintiff,

v.

Mary K. BOWMAN and Karl Porfirio d/b/a Baum's Florist, Counterdefendants.

Bankruptcy No. 3–84–00414.
Adv. P. No. 3–85–1075.

United States Bankruptcy Court, E.D. Tennessee.

Aug. 25, 1986.

James M. Crain, Knoxville, Tenn., for plaintiffs.

Robertson, Williams, Ingram & Overbey, James A. McIntosh, Knoxville, Tenn., for defendant Gordon F. Scott.

Michael H. Fitzpatrick, Knoxville, Tenn., for trustee.

CLIVE W. BARE, Bankruptcy Judge.

This is an action by the purchaser of the debtor's assets against the debtor, its former corporate president, and the trustee in bankruptcy for shortage of "inventory and equipment" and to recover accounts receivable collected subsequent to the closing of the sale.

I

On March 14, 1984, Baum's Florist, Inc. filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Thereafter, the debtor operated as debtor in possession until January 15, 1985, at which time the debtor moved for conversion to a case under Chapter 7. The order for relief under Chapter 7 was entered January 16, 1985. Also, on January 16, 1985, John D. Kreis was appointed trustee.

In December 1984, William Jones, an employee of VR Business Brokers, a company in the business of representing parties in the buying and selling of businesses, was contacted by Dan McGehee, the debtor's attorney, who inquired whether Jones knew anyone who might be interested in purchasing the debtor's assets. Jones visited McGehee's office where they discussed some particulars of the debtor's business. Jones was advised that the debtor was in Chapter 11 and that Jones' company could not obtain a firm agreement on listing the business for sale. Subsequent to the meeting Jones received some documents relating to the business from McGehee, from Carey Scott, general manager of the debtor, and from Gene Atkinson, who was involved in the accounting or bookkeeping, but not the operations, of the debtor.

On or about December 10, 1984, Jones informed one of the plaintiffs, Mary Bowman, that the debtor was for sale. The plaintiffs engaged Jones as a representative of VR Business Brokers to represent them in efforts to purchase the debtor's assets.

In addition to the information previously received, Jones reviewed the bankruptcy case file, which reflects that on the day of filing its bankruptcy petition the debtor had equipment valued at $15,000.00 and inventory worth $37,000.00. The bankruptcy file also reflects that the debtor was required pursuant to a cash collateral order to maintain an inventory level of not less than $37,000.00 at cost while using cash collateral.[1] At some point in time prior to January 8, 1985, Jones obtained an undated list of equipment (Exhibit 3) ostensibly representing the debtor's equipment, reportedly valued at $56,620.35. Jones never sought to reconcile the discrepancy between the values reported in the debtor's schedules and the list of equipment with any record or representative of the debtor. Further, Jones never undertook to review the debtor's records to verify the accuracy of a December 31, 1984 accounts receivable printout.

Plaintiff Mary Bowman testified she relied upon Jones and that she had told him she would need a list of the debtor's assets. She mistakenly assumed that the undated list of equipment (Exhibit 3), reflecting a value of $56,620.35 (obtained from Gene Atkinson by Jones) was a record filed in the debtor's bankruptcy case. Jones and Bowman visited two of the debtor's four business locations prior to January 8, 1985, but they did not itemize, nor obtain an itemization of, the assets of the debtor at any of the locations. Jones testified that he never compared the undated list of equipment (Exhibit 3) with the equipment actually in the debtor's possession.

On or about January 8, 1985, the plaintiffs through Mr. Jones tendered an offer to purchase (Exhibit 4) the debtor's assets to Dan McGehee, the attorney for the debtor. Acceptance of the offer by the debtor is acknowledged by the signature on the offer of "Gordon F. Scott, President." At no time did the plaintiffs have any contact with Gordon F. Scott, the president of the debtor. The purchase price offered for the debtor's assets was $60,000.00. The terms required a $40,000.00 down payment and payment of the $20,000.00 balance in full by July 8, 1985. An addendum to the offer to purchase specified seven contingencies which had to be satisfied by January 23, 1985. The initial offer contemplated closing on February 1, 1985; however, the closing was extended by agreement of the parties to February 7th.

Following the appointment of John D. Kreis as trustee, the parties requested that Kreis seek authorization from the court for permission to consummate the sale. A Motion to Sell Assets of the Debtor, filed on January 18, 1985, recites in part: "2. That the Trustee has received an offer for the sale of the assets of the Debtor and which offer is attached herewith as 'Exhibit A.'" Exhibit A to the trustee's motion, Exhibit 4 at trial, provides in part:

4. The full purchase price shall include inventory of $35,000 at Sellers cost.

1. See Orders entered March 28 and May 15,     1984.

If the actual amount is more or less, the purchase price and down payment shall be adjusted accordingly.

On February 7, 1985, plaintiffs and the trustee executed an "Agreement and Bill of Sale," prepared by Dan McGehee, transferring the debtor's assets to plaintiffs. At the closing, plaintiffs waived the requirement that the debtor's two motor vehicles, encumbered by a bank's security interest, be transferred free and clear of liens. Plaintiffs also waived the condition that they be able to succeed to the lease at one of the debtor's business locations. Undisputedly, there was no discussion at the closing respecting the amount of debtor's inventory. The undated list of equipment (Exhibit 3), mistakenly relied upon by Bowman, also was not discussed.[2]

On February 13, 1985, the court entered an order confirming the trustee's sale. Approved for entry by the trustee, the confirming order provides in part:

IT IS ORDERED that the Trustee of the Debtor be allowed to sell the assets of the Debtor to Mary Kay Bowman and Karl Porfirio d/b/a Baum's Florist, A Partnership, *in accordance with the contract of sale as attached to the Trustee's motion,* for the sum of $60,000.00.... (Emphasis added.)

The contract of sale attached to the trustee's motion is plaintiffs' offer to purchase, accepted on behalf of the debtor by Gordon F. Scott prior to conversion to Chapter 7. As previously noted, the offer explicitly provides: "The full purchase price shall include inventory of $35,000 at Sellers cost."

Pursuant to his obligation under the February 7, 1985 Agreement and Bill of Sale, the trustee hired workmen to move the debtor's assets to plaintiffs' place of business. According to the trustee, 321 man-hours were required to move the assets plaintiffs purchased. The trustee was not notified that any asset could not be moved.

Bowman testified that she and co-plaintiff Karl Porfirio opened for business on March 1, 1985, as Baum's Florist, a partnership, at their Gay Street location. They also opened their Farragut store during March 1985. According to Bowman, plaintiffs did not inventory the assets purchased from the trustee until March 1, 1985, three weeks after the closing of their purchase agreement.[3] Bowman further testified that two former employees of the debtor assisted her in the inventory, which required two or three days. Based on this inventory, plaintiffs valued the inventory received from the trustee at only $2,580.70. However, this value does not represent "Seller's cost" because plaintiffs never received records establishing the debtor's cost of the inventory.

Bowman also testified that problems were encountered in attempting to collect accounts receivable. In some instances the accounts listed on the December 31, 1984 printout had previously been paid. Numerous other accounts are uncollectible because there is no documentation evidencing the account. With the exception of the December 31, 1984 accounts receivable printout, Bowman admits that she never inspected the books or any record of the debtor.

On June 21, 1985, through their attorney, plaintiffs contacted the trustee to complain about the shortage of inventory, difficulty collecting accounts receivable, and the absence of equipment they expected to receive. They did not, however, seek to rescind their purchase agreement with the trustee. On July 8, 1985, plaintiffs filed their complaint seeking damages for breach of contract. Plaintiffs ask for judgment for the value of the undelivered equipment they expected to receive, plus the difference between $35,000.00 and the value of the inventory they actually received, plus $595.00 paid to re-establish an FTD account, plus net collections on the debtor's accounts receivable since the Feb-

2. This list was not attached to either plaintiffs' offer to purchase or to the Agreement and Bill of Sale.

3. Delivery of all the assets purchased apparently was not accomplished until February 23, 1985.

ruary 7, 1985 purchase agreement closing date.

Denying that plaintiffs are entitled to any relief, the trustee counterclaims seeking judgment for the $20,000.00 unpaid balance he contends is owing to the estate pursuant to the February 7, 1985 Agreement and Bill of Sale.

At the conclusion of the proof defendant Gordon F. Scott moved for dismissal of the complaint against him. Bowman conceded that defendant Scott never made any representation to her about the debtor's business. Further, defendant Scott acted only in a representative capacity. Hence, the court granted Scott's motion.

## II

The trustee contends that he conveyed to the plaintiff all of the assets of the debtor; that plaintiffs had ample opportunity to inspect the assets they purchased; and that plaintiffs' principal interests were obtaining the Baum's trade name and reopening in time to take advantage of Valentine's Day business. The trustee also asks the court to consider the fact that plaintiffs did not take any action until the eve of their obligation to pay the $20,000.00 balance, nearly four months after they were admittedly aware of the inventory shortage, absence of equipment they expected to receive, and problems with collecting the accounts receivable.

■ Insofar as the "undelivered" equipment, the trustee is clearly not liable to the plaintiffs. There is no provision in any agreement between plaintiffs and the trustee, nor any representation by him, identifying the debtor's equipment. Bowman mistakenly assumed that Exhibit 3, presented to her by her agent (Jones), represented the debtor's equipment. The proof does not establish that any misrepresentation as to the debtor's equipment was made to either plaintiffs or their agent (Jones).

■ Respecting accounts receivable, the trustee does not dispute plaintiffs' rights to payments made after the closing on February 7, 1985. Any proceeds received after the closing belong to plaintiffs.

The trustee is also not liable for the $595.00 fee plaintiffs paid to re-establish the Baum's FTD account. The trustee agreed to transfer only whatever rights the debtor had in the FTD account.

While Bowman conceded the trustee made no representations to plaintiffs other than those in the February 7, 1985 Agreement and Bill of Sale, plaintiffs insist that the trustee adopted the purchase agreement entitling them to receive inventory worth $35,000.00. Bowman testified that the debtor's inventory was a variable factor in the purchase price. Indeed, as previously noted, the accepted purchase offer recites: "If the actual amount [of inventory] is more or less [than $35,000.00], the purchase price and down payment shall be adjusted accordingly."[4]

The trustee asserts: "It is completely unbelievable that a party buying a business which has discovered a major deficit in equipment, *a $29,000.00 deficit in inventory* and a major difference in the amount and collectibility of accounts receivable would sit and do nothing when they had a fledgling business to capitalize. The only explanation is that the Plaintiffs got an inventory which satisfied the requirements of the seller under the contract."[5] While plaintiffs' delay in complaining about the inventory shortage is puzzling,[6] the evidence does not support a finding that plaintiffs received the value of inventory to which they are entitled.

The February 7, 1985 Agreement and Bill of Sale does not provide that it represents the parties' entire agreement. The preamble recites in part:

---

4. The agreement also provides for a $60,000.00 "Total Purchase Price with Right of Offset."

5. Proposed Findings of Fact and Conclusions of Law at 9–10.

6. The only explanation for the delay was that plaintiffs were busy trying to assure the success of the Baum's partnership. This explanation is not credible.

WHEREAS, Seller is the Trustee in the Chapter 7 Bankruptcy of Baum's Florist, Inc. ... and is acting pursuant to the Hearing on the sale of the assets ... wherein the Court ordered that it was in the best interest of the Debtor to sell the assets of the estate, *and that the Purchasers were willing to purchase* the assets *under the terms and conditions* as more fully *set forth in the offer proposed by the Purchasers....* (Emphasis added.)

Further, as previously noted, the accepted purchase offer is incorporated by reference in both the trustee's motion to sell the debtor's assets and the court's order confirming the sale. The court is persuaded that the plaintiffs' contract with the trustee entitles them to $35,000.00 worth of inventory at seller's cost or an appropriate adjustment in the purchase price.

Apparently there are no records available to establish the seller's cost of the inventory plaintiffs acquired from the trustee. According to the debtor's schedules the debtor had $37,000.00 worth of inventory as of March 14, 1984. The debtor's operating report for the period ending July 31, 1984, reflects an inventory value of $37,159.05. Subsequent monthly operating reports do not include inventory values. Plaintiffs' $2,580.70 valuation of the inventory received from the trustee is based upon: (1) the experience of two former employees of the debtor participating in the inventory; (2) plaintiffs' knowledge acquired through ordering additional inventory necessary to commence business; and (3) in some instances prices marked on boxes. However, the cost of the additional inventory ordered by plaintiffs may be different from the cost of the inventory purchased from the trustee. Further, it is not clear whether the prices on some boxes of inventory represented costs or the debtor's sale prices. Plaintiffs have not maintained a separate record of sales of inventory they acquired from the trustee.

■ A judgment for damages is prohibited when the existence of damage is uncertain, not when the amount is uncertain.

*Cummins v. Brodie,* 667 S.W.2d 759, 765 (Tenn.Ct.App.1983). Proof of damages within a reasonable degree of certainty is all that is required to establish the measure of damages. *Redbud Coop. Corp. v. Clayton,* 700 S.W.2d 551, 561 (Tenn.Ct.App. 1985). Mathematical certainty is not necessary. *Coverdell v. Mid-South Farm Equip. Ass'n,* 335 F.2d 9, 14 (6th Cir.1964). It is sufficient if the extent of damage is a matter of just and reasonable inference, even though the result is only an approximation. *Lee Shops, Inc. v. Schatten-Cypress Co.,* 350 F.2d 12, 18 (6th Cir.1965), *cert. denied,* 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966).

■ Plaintiffs' March 1, 1985 inventory is the only evidence of the inventory items conveyed by the trustee. Because the inventory does not reflect the inventory at "seller's cost," its usefulness is limited for the purpose of determining the setoff to which plaintiffs are entitled due to the inventory shortage. While the trustee has not refuted the inventory list proferred by the plaintiffs, plaintiffs' delay in notifying the trustee of the inventory shortage impaired his ability to defend this action. Nevertheless, the court finds that the value of the inventory at "seller's cost" delivered by the trustee to the plaintiffs did not exceed $15,000.00. Accordingly, plaintiffs are entitled to the $20,000.00 escrow, and the trustee's counterclaim shall be dismissed.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.