IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 19, 2008 Session

# TRAVIS GOODMAN, ET AL. v. KATHY JONES KELLY

**Appeal from the Circuit Court for Morgan County**
**No. 6477-C   Russell E. Simmons, Jr., Judge**

**No. E2006-2678-COA-R3-CV  - FILED OCTOBER 30, 2008**

Travis and Stephanie Goodman ("Buyers") filed a lawsuit for monetary damages or rescission of a residential deed due to defects in a septic system.  Buyers sued under the theories of breach of contract, misrepresentation, fraud and violation of the Tennessee Consumer Protection Act. Buyers  argue that they did not plead a violation of Tenn. Code Ann. § 66-5-208 (2004) of the Tennessee Residential Property Disclosures Act; however, the trial court treated the case as one under the Act.  The jury returned a verdict for Seller. Reviewing the record *de novo*, we hold that the theories of breach of contract and negligent misrepresentation were pleaded and supported by the proof.  These causes of action should have been charged to the jury.  We also hold that the parties litigated the issue of  intentional misrepresentation and that the trial court charged the jury on this issue.  In addition we hold that material evidence supports the jury's verdict for Seller under theories of  intentional or willful misrepresentation of the condition of the subject property under the statute or common law. Accordingly, we affirm in part, vacate in part and remand with instructions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part and Vacated in Part; Case Remanded with Instructions**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J, and SHARON G. LEE, SP.J., joined.

Glenna W. Overton, Knoxville, Tennessee, for the appellants, Travis Goodman and Stephanie Goodman

Joe R. Judkins, Wartburg, Tennessee, for the appellee, Kathy Jones Kelly

**OPINION**

In May 2004, Buyers purchased a 14-year-old house in a subdivision, from Seller for $86,500. Seller had been the only prior owner of the residence. Several weeks after moving into the residence, Buyers discovered two inches of water in the crawlspace. Within three months of moving into the house, Buyers had problems with the septic system. The shower would not drain, and, at times, the commode would not flush and would overflow. When Buyers did laundry, water backed up into the bathtub. On at least one occasion when Buyers did laundry, sewage backed up into the tub. Because of health concerns, Buyers took their young child to another house for bathing.

Buyers found water in the crawlspace on numerous times, and sometimes they also found sewage. After heavy rain, water would stand on the property for days at a time and the septic system did not work. Buyers put a fan in the crawlspace and diverted the water from gutters away from the septic system. These attempts did not solve the problems. Buyers also had the septic system pumped twice in November 2004 and learned at that time that water in the drain field was running into the septic tank.

In April 2006, Buyers had the septic tank pumped again, and as water was pumped from the tank, the tank would immediately fill up with clear water. Buyers videotaped the pumping, and the videotape was shown to the jury. In about an hour, the septic company employee pumped some 1,860 gallons of water out of a 900-gallon septic tank.

Following this, Buyers moved out of the house to a rented house and sued Seller for fraud, misrepresentation – which we construe to include both negligent and intentional conduct, breach of contract and violation of the Tennessee Consumer Protection Act. In their complaint, the Buyers alluded to the Seller's "Tennessee Residential Property Condition Disclosure" although they did not specifically mention that which created the form – the Tennessee Residential Property Disclosure Act, Tenn. Code Ann. § 66-5-201, *et seq*. Buyers acknowledge in their brief that the Tennessee Consumer Protection Act claim was correctly dismissed by the trial court.

At trial, Buyers called as an expert witness a civil engineer. He testified that the subdivision was built on a valley floor, surrounded by hills and low mountains. The effect of the surrounding topography was to create a sort of bowl with the Buyers' home being on one of the lowest lots in the subdivision. The expert noted that there had been no change in the watershed since the home was constructed. He also relied on records of the Health Department that showed there was a study of the subdivision in 1990 that found most of the houses in the subdivision had, or were having, failures of their septic systems due to excess groundwater.

The civil engineer had seen the videotape of the April 2006 pumping of the septic tank and expressed his opinion that the septic system drain field was working in reverse. Instead of dispersing liquids from the septic tank, it was functioning as a conduit for the groundwater to fill up the tank. Thus, the groundwater was filling the septic tank faster than the water in the tank could be pumped out by the septic company.

The expert testified that the groundwater level at the property fluctuates somewhat seasonally, but the real problem is a confining layer of soil that is several feet underground and prevents water from seeking a deeper zone. The expert stated that:

[i]t is my opinion that the problem with the septic tank will occur at any time that the water table in the neighborhood is higher than the elevation of the drain field. I saw no evidence in my site visit to the neighborhood to indicate that this was a recent phenomenon. And it is my opinion that this has likely been going on since the subdivision was constructed.

In reaching his opinions, the expert had also examined and relied on water-use records for the property. He testified that the average water use per person in the United States is 100 gallons a day or 3,000 gallons a month. From January 2000 through June 2004, there were four months in which Seller used only 200 gallons a month – this would be approximately one flush of the commode per day. During the time Buyers were considering buying the property, Seller's water usage was merely 200 to 1,000 gallons a month. The expert thus expressed the opinion that Buyers could not have determined whether the septic system was damaged, and a home inspector could not have discovered the damage without digging up the system. A home inspection was made in this case, but the home inspection is based on visual inspection and did not include the septic system.

Buyers' expert also testified that shallow groundwater contaminated with sewage entering the crawlspace could cause a health hazard. In addition, he said that the system cannot be corrected, because the groundwater table is higher than the septic tank. When he was asked, based on everything that he had reviewed, whether it was it possible for Seller to reside in the house for 14 years without experiencing a problem, the expert responded, "[T]hat's not possible."

As part of their proof, Buyers submitted the Tennessee Residential Property Condition Disclosure that Seller filled out prior to the sale. One question on the disclosure form was, "Are you (Seller) aware of any defects/malfunctions in [sewer/septic]?" Given the choices of "yes," "no" and "unknown," Seller answered "no." In another section of the disclosure form, Seller was asked, "Are you (Seller) aware of any of the following," with one of the following categories being "flooding, drainage or grading problems?" Once again, given a choice of answering, "yes," "no," or "unknown," Seller answered "no." In addition, to a question whether the septic tank meets "present state and local requirements for the actual land area and number of bedrooms and facilities existing at the residence[,]" Seller answered "yes." Seller attested that the information supplied was "true and correct [to] the best of my/knowledge as of the date signed." In the sales contract, Seller warranted that the septic system (along with a number of other systems) would be working on the date of the closing.

Seller testified that water would stand on the property for two to three days. She said that she never inspected the crawlspace and did not know if water or sewage were in it. Seller testified that she was often away on weekends. She also said that she had contracted for the original construction of the house, which came with a one-year warranty, and there were no problems with the septic system during the period of the warranty.

Seller testified that, during the entire time she owned the property, she had no problems with the septic system and that there were no signs indicating there might be a problem with the system. Seller had no repairs performed on the septic system and had not had the septic tank pumped. A

woman who cleaned Seller's house, and came to the house regularly, testified that she had seen no problem with the septic system. Neighbors also testified that they had seen no problem with the system. Seller's fiancé, who was at the house regularly, was not aware of any septic system problems and neither was the home builder. Although the Health Department had done a study, no one at the Department had ever contacted Seller. And Buyers' home inspector and appraisers for Buyers' lender did not uncover a problem.

Seller also established that the home inspection could have included a septic system inspection if Buyers had requested it. Also, Buyers waived their right to purchase a home warranty that would have cost around $300. Seller did not produce an expert witness.

## II.

The following issues are stated by the Buyers:

> 1. Whether the trial court erred by not charging the jury with the definitions of breach of contract, misrepresentation, fraud and negligent misrepresentation.

> 2. Whether the trial court erred by holding that the burden of proof was clear and convincing evidence.

> 3. Whether the jury verdict was contrary to the weight of the evidence presented at trial.[1]

## III.

Our standard of review as to findings of fact by a jury in a civil action is limited to determining whether there is material evidence to support the verdict. *See* Tenn. R. App. 13(d). Appellate courts do not determine the credibility of witnesses or weigh the evidence on appeal from a jury verdict. *See* **Pullen v. Textron, Inc**., 845 S.W.2d 777, 780 (Tenn. Ct. App. 1992) (citing **Crabtree Masonry Co. v. C & R Constr., Inc.**, 575 S.W.2d 4, 5 (Tenn. 1978)). With respect to factual issues, a judgment based on a jury verdict will not be disturbed on appeal when the record contains material evidence supporting that verdict. *See* **Reynolds v. Ozark Motor Lines, Inc**., 887 S.W.2d 822, 823 (Tenn. 1994).

The determination whether jury instructions are proper is a question of law that this court reviews *de novo* with no presumption of correctness. *See* **Solomon v. First Am. Nat'l Bank of Nashville**, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989). The determination is crucial because

---

[1] These issues were preserved for appeal when Buyers raised them in a motion for a judgment notwithstanding the verdict or for a new trial, and the motion was denied.

the soundness of every jury verdict rests on the fairness and accuracy of the trial court's instructions. Since the instructions are the sole source of the legal principles needed to guide the jury's deliberations, trial courts must give substantially accurate instructions concerning the law applicable to the matters at issue.

*Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 94 (Tenn. Ct. App. 1996) (citations omitted). We consider the jury charge as a whole, and we will not invalidate it if it fairly defines the legal issues in the case and does not mislead the jury. *See* **Hunter v. Burke**, 958 S.W.2d 751, 756 (Tenn. Ct. App. 1997) (citations omitted).

IV.

A.

Buyers argue that the trial court erred in failing to charge the jury with respect to the theories of breach of contract, misrepresentation, fraud and negligent misrepresentation. They argue that the trial court instead charged the jury solely concerning a violation of Tenn. Code Ann. § 66-5-208 of the Tennessee Residential Property Disclosure Act.

Seller argues that the trial court charged the jury under the theories of misrepresentation and fraud, but does not cite to the record. After reviewing the charge as a whole, it is clear that the trial court did not charge the jury on the theories of breach of contract or negligent misrepresentation, but the court did instruct the jury under Tenn. Code Ann. § 66-5-208, giving a generic instruction on intentional misrepresentation.

The trial court's charge as to misrepresentation was as follows:

> [Buyers] seek rescission of the sale of the home for alleged intentional misrepresentation of [Seller]. To have the sale rescinded, [Buyers] must prove by clear and convincing evidence each of the follow[ing] elements:
>
> No. 1, that [Seller] made a representation of a present or past material fact on the Disclosure Statement entered as Exhibit 2.
>
> No. 2, that the representation was false.
>
> And No. 3, that [Seller] knew the representation was false when it was made.
>
> And No. 4, that . . . [Seller] intended that [Buyers] rely upon the representation and act or not act in reliance on it.

-5-

And No. 5, [Buyers] did not know that the representation was false, and [were] justified in relying upon the truth of the representation.

And No. 6, as a result of [Buyers'] reliance upon the truth of the representation, [Buyers] sustained damage.

The charge the court gave does not precisely parallel the language of Tenn. Code Ann. § 66-5-208. It is essentially identical to the the Tennessee Pattern Jury Instruction on "Intentional Misrepresentation" requested as "Plaintiffs' Jury Instruction Number 6." Buyers' requested instruction states:

1. [Seller] made a representation of a present or past material fact; and

2. The representation was false; and

3. [Seller] knew that the representation was false when it was made; and

4. [Seller] intended that [Buyers] rely upon the representation and act in reliance on it; and

5. [Buyers] did not know that the representation was false and [were] justified in relying upon the truth of the representation; and

6. As a result of [Buyers'] reliance upon the truth of the representation, [Buyers] sustained damage.

T.P.I. 3 – Civil 8.36.

In the complaint at a section titled "Allegations of Liability," Buyers allege:

18. The Defendant perpetrated a fraud by failing to disclose, through the Tennessee Residential Property Condition Disclosure, a defect/malfunction of the septic system that existed since the residence was constructed.

19. The Defendant misrepresented by failing to disclose, through the Tennessee Residential Property Condition Disclosure, that there were no defects/malfunctions of the septic system.

20. The Defendant misrepresented by failing to disclose, through the Tennessee Residential Property Condition Disclosure, that there was no drainage, flooding or grading problems.

-6-

21. The Defendant has breached the Sales Contract by the fraud and misrepresentation contained in the Tennessee Residential Property Disclosure.

Although Buyers argue that they stated no cause of action for violation of Tenn. Code Ann. § 66-5-208 of the Tennessee Residential Property Disclosure Act, a review of paragraphs 18-21 of the complaint makes clear why both Seller and the court concluded that a statutory cause of action was pleaded.[2]

There is nothing in the record before us showing that the trial court failed to recognize and charge the Buyers' theory of *common law* fraud or intentional misrepresentation. In fact, the court gave the jury a generic but complete charge on the subject of intentional misrepresentation. Under the facts of this case, we hold that the Buyers' theory of common law fraud or intentional misrepresentation[3] was fully litigated, correctly charged, and resolved by the jury's verdict. *Cf.* Tenn. R. Civ. P. 15.02 (2007) (when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings); **Redbud Coop. Corp. v. Clayton**, 700 S.W.2d 551, 558 (Tenn. Ct. App. 1985) (implied consent found to try all legal theories against developers where legal theories pursued were unclear to both parties and the court). The jury found in favor of Seller. As a result, there is no remaining cause of action based on intentional misrepresentation under the Tennessee Residential Property Disclosure Act or the common law.

A trial court should instruct the jury upon every issue of fact and theory of the case that is raised by the pleadings and is supported by the proof. **Ward v. Glover**, 206 S.W.3d 17, 40 (Tenn. Ct. App. 2006); **Street v. Calvert**, 541 S.W.2d 576, 584 (Tenn. 1976); **Spellmeyer v. Tenn. Farmers Mut. Ins. Co.**, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). Reviewing the record *de novo*, we find that Buyers alleged, and the proof supported, the common law theories of breach of contract and negligent misrepresentation. The trial court erred in not letting those two theories go to the jury. We thus affirm in part and vacate in part. The case is remanded for a new trial on the issues of breach of contract and negligent misrepresentation.

B.

Seller argues in this court that the trial court correctly required Buyers to elect a remedy prior to the case being submitted to the jury. Seller relies on **Concrete Spaces, Inc. v. Sender**, 2 S.W.3d 901 (Tenn. 1999), for the proposition that when there is a danger of a double recovery, there must be an election of remedies. It would appear, however, that Seller's definition of double recovery is different from that of the Supreme Court in **Concrete Spaces**. Seller seems to use the term "double recovery" to mean recovery under more than one theory – *i.e.*, a party cannot pursue alternate

---

[2] No issues concerning abrogation of common law, exclusive remedy or the like are raised in this appeal.

[3] Intentional misrepresentation, fraudulent misrepresentation, and fraud are synonymous. **Concrete Spaces, Inc. v. Sender**, 2 S.W.3d 901, 904, n 1. (Tenn. 1999).

theories for recovery. Under the Supreme Court's use of the term, however, a party can pursue alternative theories of recovery but can collect under only one theory. The Supreme Court states that a "double recovery may occur if the jury decides that the plaintiff is entitled to both punitive damages and multiple damages." *Id*. at 906. Statutory treble damages would be an example of "multiple damages." The reason for the rule is that recovery of both multiple statutory damages and punitive damages constitute "an impermissible double recovery because the two forms of enhanced damages serve the same functions." *Id.*

In this case, contrary to Seller's argument, there was no danger of a recovery of both punitive and multiple statutory damages, because the Tennessee Residential Property Disclosure Act does not allow for any multiple statutory damages and the trial court did not instruct the jury concerning punitive damages. *See generally* Tenn. Code Ann. § 66-5-208 (purchaser's remedies for owner's misrepresentation on residential property disclosure statement shall be actual damages, termination of sales' contract if discovery of misrepresentation precedes closing or other remedies available at law or equity for intentional or willful misrepresentation.)

Prior to trial, Seller moved the trial court *in limine "*for an Order requiring [Buyers], *prior to empanelling* [sic] *a jury*, to elect which remedies [Buyers] are seeking." (Emphasis added.) It is clear from reviewing the jury charge that the trial court required an election of remedies prior to giving the case to the jury and thus gave no instructions on the various damages available under the common law theories of negligent misrepresentation and breach of contract. Rather, the trial court instructed the jury solely as to the remedy of rescission. The jury was instructed to return a general verdict as follows:

> If you find in favor of [Buyers], your verdict will be, "We find in favor of [Buyers] and award [Buyers] rescission of their purchase of the residence from [Seller]." If you find in favor of [Seller], your verdict will be, "We find in favor of [Seller]."

The jury was given no opportunity to award monetary damages.

The procedure followed in this case is directly contrary to the instructions of the Supreme Court in *Concrete Spaces.* Furthermore, Seller's reliance on *Concrete Spaces* is misplaced. In this case Buyers were required to make an election of remedies prior to the case being submitted to the jury. In *Concrete Spaces,* the Supreme Court explicitly rejected the minority rule, which "requires plaintiffs to make an election of remedies before the issues are submitted to the fact finder." *Concrete Spaces*, 2 S.W.3d at 909 (citations omitted). To the contrary, the High Court adopted the rule that does not require an election of remedies until the jury has returned a verdict, stating:

> We agree with the reasoning of the majority of jurisdictions confronted with the issue that it would be unfair to require election before a determination of liability and entitlement to punitive damages and multiple damages has been made. In so concluding, we agree . . . that this approach does not unduly burden a defendant who has been found liable under more than one theory of recovery. The majority rule simply allows a plaintiff to realize the maximum

-8-

recovery available under the fact finders' findings. Given the punitive and deterrent purposes of punitive and multiple damages, such a result is entirely proper.

The majority approach is also consistent with our Rules of Civil Procedure, which reflect the notion that plaintiffs are free to pursue several alternative theories of recovery and to structure their claims in the manner that is most beneficial to them. Again, the election of remedies doctrine serves only to prevent double redress for a single wrong. (Citations omitted.) If a defendant has been found liable under more than one theory of recovery, no inequity results from allowing the plaintiff to choose one of the claims upon which to realize its maximum recovery of enhanced damages. In other words, no danger of double recovery exists unless the plaintiff actually realizes satisfaction of both forms of enhanced damages. (Citation omitted.)

*Id.* The Supreme Court also noted that Tenn. R. Civ. P. 8.01 specifically provides that "relief in the alternative or of several different types may be demanded." *Id*. at n 12 (quoting Tenn. R. Civ. P. 8.01)).

In *Concrete Spaces,* the Supreme Court set out explicit procedures to be followed by a court in circumstances where it must give jury instructions concerning multiple common law theories and a statutory theory or theories that have different elements, damages and burdens of proof. *Concrete Spaces*, 2 S.W.3d at 909-11. For example, the Court stated:

Courts should provide separate jury instructions for each theory of liability that clearly explain the elements of each claim, thus enabling the jury to consider whether the plaintiff has met its burden of proof with respect to each. The standards for any available enhanced damages should be explained in conjunction with the instructions for each underlying theory of recovery. For example, the intentional, fraudulent, malicious or willful standard for punitive damages required by *Hodges,* 833 S.W.2d at 900-901, should be explained within the separate instructions for the underlying common law claims. Likewise, if the jury is to decide the requisite culpability for multiple damages under a statute, an explanation of that standard should be given in conjunction with the instructions for that particular statutory claim.

As the Court of Appeals in this case recognized, the most effective approach in dealing with multiple claims for relief is to require the jury to respond either to a general verdict form accompanied by special interrogatories or to a special verdict form that has been prepared to parallel the instructions to the jury on each claim.

*Id*. at 910. In contravention of the holding in **Concrete Spaces**, the trial court required Buyers to elect a remedy prior to trial instead of waiting until after the jury returned a verdict on all theories. Upon remand for trial on the theories of negligent misrepresentation and breach of contract, no election of remedies shall be required prior to trial and the procedures set out by the Supreme Court in **Concrete Spaces** for charging the jury shall be followed.

C.

In this case, Buyers also raise the issue that the trial court erred by failing to give Plaintiffs' Jury Instruction Number 4, on preponderance of the evidence. Preponderance of the evidence is the burden of proof required in actions for negligent misrepresentation and breach of contract. As previously noted, the trial court refused to give Buyers' jury instruction for the theories of negligent misrepresentation and breach of contract; thus, it also failed to instruct the correct burden of proof (preponderance of the evidence) for these causes of action. At the retrial on remand, the trial court shall instruct that the burden of proof as to those theories is preponderance of the evidence.

D.

The remaining issue raised by Buyers is that the jury verdict was contrary to the weight of the evidence presented at trial. With respect to factual issues, a judgment based on a jury verdict will not be disturbed on appeal where the record contains material evidence supporting that verdict. *See* **Reynolds v. Ozark Motor Lines, Inc**., 887 S.W.2d 822, 823 (Tenn. 1994) (citations omitted). In this case there was evidence favorable to Seller that was sufficient to sustain a verdict for Seller on the theory of intentional misrepresentation, whether under the common law or for violation of Tenn. Code Ann. § 66-5-208. Accordingly, we affirm the jury's verdict.

V.

The judgment of the trial court is affirmed in part and vacated in part. The case is remanded for further proceedings, with instructions. Costs of this appeal are taxed against the appellee, Kathy Jones Kelly.

_____
CHARLES D. SUSANO, JR., JUDGE