IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 8, 2011 Session

## WILSON REYNOLDS v. LEE ROY ROBERSON, JR.

**Appeal from the Circuit Court for Blount County**
**No. E21910     Hon. Jon Kerry Blackwood, Special Judge[1]**

**No. E2010-02593-COA-R3-CV-FILED-MAY 4, 2012**

This appeal involves a contract dispute over the purchase of more than 100 acres of rustic property adjacent to the Great Smoky Mountains National Park. Wilson Reynolds offered to purchase the property from Lee Roy Roberson, Jr. for 3 million dollars. The parties formed a contract evidencing their agreement. Following the closing date, Wilson Reynolds filed suit, alleging breach of contract. The trial court ruled that Lee Roy Roberson, Jr. breached the contract and awarded Wilson Reynolds $600,000 in damages plus interest, attorney fees, and other costs. Lee Roy Roberson, Jr. appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

John M. Jackson and Barton C. Williams, Maryville, Tennessee, for the appellant, Lee Roy Roberson, Jr.

Chris Ralls, Maryville, Tennessee, for the appellee, Wilson Reynolds.

**OPINION**

**I. BACKGROUND**

---

[1]Pursuant to a standing order from the Administrative Office of the Courts, Special Judge Blackwood was sitting by interchange for Judge Dale Young.

Wilson Reynolds ("Buyer"), a professional photographer, was in Cades Cove for the weekend when he discovered Townsend, Tennessee. He "fell in love with the town" and was reminded of his "dream [of] almost nine years to own [his] own outdoor resort." He decided to purchase some property in pursuit of that goal. When purchasing Karns Log Cabin Development, he was informed of a similar property owned by Lee Roy Roberson, Jr. ("Seller"). Seller's property was more than 100 acres and contained antique Appalachian log cabins designed and built by Seller, who used the cabins as a gallery to showcase his artwork and to conduct church services.[2]

Buyer made an initial offer on the property that was rejected. Subsequently, Buyer offered to purchase the property for the list price, subject to certain stipulations. Seller accepted the offer and the accompanying contract. The contract provided for a purchase price of 3 million dollars with a closing date of May 15, 2006. Buyer's obligation to close was not subject to a financial contingency, and Buyer could not obtain possession until the deed was delivered. Buyer submitted $10,000 in earnest money when he signed the contract. Several stipulations were handwritten into the contract. These provisions provided,

> 1) [Purchase is contingent] upon clean deed to easement to property.
>
> 2) Buyer intends to use this transaction to qualify as a tax free exchange under section 1031 of the Internal Revenue Code and the seller agrees to cooperate in that effort. [Buyer] will have the right to assign this contract so that the transaction will qualify under Section 1031.
>
> 3) Down payment of $500,000, note to be held by [S]eller for 1 [year] payable in full with interest of 5% ($125,000) on anniversary of note.
>
> 4) Seller to keep insurance on property until 8/15/06. Buyer to furnish additional liability insurance on property. Seller has until 8/15/06 to remove personal items from gallery.
>
> 5) Buyer will not place any liens or incumberances against property until Seller is paid in full for property.

The parties executed a series of addendums to the contract. The first addendum ("Addendum A") allowed Buyer to obtain possession of the property prior to the closing date if he remitted the $500,000 non-refundable down payment and paid all utilities. Two days after the contract was signed, the parties agreed to the second addendum ("Addendum B"), which

---

[2]The gallery was known as the Lee Roberson Gallery.

charged Buyer with responsibility for "all maintenance and upkeep, to begin when $500,000 non-refundable down payment [wa]s paid to Seller on or before May 15, 2006." The third ("Addendum C"), fourth ("Addendum D"), and fifth addendums ("Addendum E") extended the deadline for the non-refundable deposit. The sixth addendum ("Addendum F") provided,

> 1) Seller grants Buyer an option to extend the closing date to 12/01/07. If said option is exercised by Buyer, Buyer shall tender an additional $50,000 non-refundable payment to Seller. Seller further grants a second option to Buyer for a second extension of the closing date until 6/01/08 in exchange for an additional $50,000 non-refundable payment to Seller.

> 2) The parties hereto agree that the purchase price is not based on the quantity of acres being conveyed.

> 3) Any and all portions of easement land lying on property owned by [Seller] which are involved with easement contingency will be deeded, after a survey, to [Buyer]. Seller will convey any fee interest in property lying in pull-offs or other areas to be shown by survey to [B]uyer.

> 4) Seller to maintain insurance in full effect until 8/31/2006. Buyer shall assume all maintenance, upkeep & utilities, except for gallery, beginning when $500,000 non-refundable down payment is paid to Seller on or before June 7, 2006. Buyer to assume all utilities on 9/1/2006.

> 5) All other terms and conditions of aforementioned Purchase & Sale agreement shall remain in full effect, other than as specifically modified herein. Upon execution by all parties, this Amendment shall be attached to and form a part of said Agreement.

On June 7, 2006, Buyer obtained possession of the property following his submission of the $500,000 non-refundable deposit and the signing of the contract at Foothills Title Services, Inc. One year later, Buyer sought to exercise the first $50,000 option to extend the closing date. Seller refused the payment because he believed that Buyer was in breach of the contract for failing to submit the interest payment on the anniversary of the signing of the contract. Seller prohibited Buyer from entering the property.

Buyer filed suit, alleging breach of contract. Buyer sought specific performance per the terms of the contract and a temporary injunction, enjoining Seller from interfering with his occupancy of the property. The amended complaint, filed sometime later, sought specific performance or recision and damages. Buyer also filed a lien against the property.

The parties subsequently agreed that pending the outcome of the litigation, Buyer could occupy the property. Seller accepted the $50,000 option payment, while maintaining that he was owed interest. In Seller's response to the complaint, he denied all allegations, asserted that Buyer owed interest, and filed a counterclaim. Seller filed a motion to dismiss, asserting that Buyer failed to state a claim upon which relief could be granted. Seller also filed a motion for an emergency restraining order and permanent injunction, enjoining Buyer from "all business activities or lodging activities to which the public at large is permitted entry onto subject property." Seller alleged that the only water source to the property had been contaminated with Escherichia coli ("E. coli") and posed a "substantial risk to anyone and everyone who comes in contact with the water." The court agreed and issued an emergency restraining order.

Shortly thereafter, Buyer remitted and Seller accepted the second option payment of $50,000, extending the closing date to June 1, 2008. Prior to closing, Buyer informed Seller that he wanted to "exercise the option of having [Seller] finance the property for one year as provided by the contract." Buyer offered to "tender one year's interest in the amount of $125,000 in advance" with the understanding that if he paid off the note "prior to its due date, then an appropriate amount of interest will be deducted from the principal balance." Seller refused the offer, asserting that Buyer could purchase the property if he remitted 2.5 million dollars pursuant to the contract.

At trial, Buyer alleged that Seller breached the contract by demanding interest and refusing to finance the property, that there was a mutual mistake of the parties, and that Seller materially misrepresented the property's water system. Seller alleged that Buyer breached the contract by failing to remit the interest payment, failed to maintain the property, and "committed a slander of title by filing and refusing to release a lien on the property."

Buyer, who was 57 years old at the time of the trial, testified that he and Seller discussed the water source for the property because he anticipated bringing students and nature photographers to the grounds, where they could take photographs and stay overnight. Seller told Buyer about the spring water source that was located on the property and claimed that the water was "wonderful" and that his employees used it and carried the water home in bottles. Seller also claimed that he "had not just thousands but hundreds of thousands of customers a year come through the gallery, and all had used the water."

As the parties negotiated, Buyer informed Seller that he hoped to sell an office building in Maryland and use the proceeds to purchase the property in a tax free exchange. Buyer explained that he executed Addendum F, which added the optional extensions, because he wanted to secure his down payment in case he was unable to maintain financing from the bank in time for the closing date. He stated, "[i]t was always understood that if [he] needed

the time to get the survey done, to get the appraisals done, to get conventional financing, that [Seller] would carry the property for one year at five percent."

Buyer testified that during one of his visits, Seller showed him how to maintain the spring. Buyer said that the spring was cleaned once a year and that he maintained the buildings and the property, ensuring that the grass was mowed on a regular basis, that the weeds were cut, that the road was cleaned, and that the heating and air units were maintained. He believed his employees "kept the place looking impeccable."

Buyer stated that on June 1, 2007, he sent his manager to deliver the $50,000 check for the optional extension. After learning that Seller refused the check, he returned to the property to find that he was locked out. He was denied access to the property and his belongings from June 7, 2007 to July 16, 2007. He received a letter, which provided, in pertinent part,

> I represent [Seller] with regard to the above matter. It is my client's position that your failure to comply with the terms of the Purchase and Sale Agreement; specifically the payment of the interest due on June 7, 2007, and the unrestricted tender of the $50,000 consideration for the extension, constitutes a default. Mr. Roberson has reoccupied the premises.
>
> Please make arrangements to remove your personal property now located on the premises within thirty (30) days.

Buyer recalled that pursuant to their agreement allowing Buyer to reoccupy the property, Seller had the right to inspect the property "from time to time, upon reasonable notice," while Buyer had the right to be present during the inspections. Buyer contended that Seller visited the property on two occasions without Buyer.

Prior to the closing date, Buyer sent Seller a letter, which provided, in pertinent part,

> Please be advised that [Buyer] desires to close this transaction pursuant to the parties' contract. He also chooses to exercise the option of having [Seller] finance the property for one year as provided by the contract. In order to show his good faith in this endeavor at closing, [Buyer] will tender one year's interest in the amount of $125,000 in advance. If [Buyer] chooses to pay off the note prior to its due date, then an appropriate amount of interest will be deducted from the principal balance. We expect to receive a full and sufficient warranty deed for the property and for all of [Seller's] rights in and to the right-of-way leading from Wears Valley Road to the property, including the

fee simple title to the pull offs and other areas as set forth in Addendum F paragraph 3 to the parties['] contract. The parties' contract contemplates a survey being done on the right-of-way; this will be done at [Buyer's] expense, but your client might have to sign a correction deed after the survey is completed and we ask that he give us an express agreement in this regard. [Seller] will have no rights to use this right-of-way ever again without [Buyer's] or his successor in interest's permission.

Since your client will be the mortgagee, we understand that during the one year period of the note he may desire to inspect the premises. We will need to have a specific agreement concerning how this will be done. [Seller's] continued trespasses and visits to the property without proper notice have chilled [Buyer's] ability to utilize this property the way he intended.

We also make this offer to close conditional on both parties dismissing their suits in full, paying their own fees and costs.

In response, Seller wrote, in pertinent part,

[O]ur conversation of June 3, 2008, indicated that your client was only interested in closing on the subject property if he were able to tender only the sum of [$125,000]. It appears to me that your client wishes to close on the subject property, have a warranty deed executed thereby transferring ownership of the property to him without paying the full purchase price. As you will recall, the purchase price for the subject property is [3 million dollars] and your client has made a down payment of [$500,000] toward that purchase price. Accordingly, [2.5 million dollars] remains to be paid for the purchase price of the property. As you know, we have asserted that [Buyer] owes interest at the sum of [5 percent] for the past [2 years] which is the time frame between the initial closing and the final closing which was set by contract to occur on June 1, 2008.

Accordingly, [Seller] is not in a position to close and deed the property to [Buyer] unless the full remaining purchase price of [2.5 million dollars] is tendered to him at closing. My client has agreed to reserve the issue of the interest, pending the outcome of current litigation. In accordance with my previous correspondence, please note that we will be glad to execute a warranty deed to [Buyer] contingent upon receiving [2.5 million dollars] from him by June 4, 2008.

I realize that during our conversation you indicated to me that your client was not in a position to close on the property and pay the sum of [2.5 million dollars] and accordingly, I have advised you that if the same does not occur, that [Buyer's] contract to purchase [Seller's] land has expired.

Buyer testified that after he received the letter, he vacated the premises and returned the property to Seller. He stated that he refused to remove the lien because he still wanted to purchase the property and because he did not want to lose the down payment.

Troy David Brown, owner of Foothills Title and Title Services, testified that he worked with the parties on the sale of the property at issue in this case. He believed the transaction was "unusual" and "unique" because it was a "cash transaction, meaning for us no lender, no outside third-party lender would be involved." He stated that he received a call from Seller in June 2006. Seller told him that he thought Buyer was in breach of the contract for failing to remit an interest payment. Mr. Brown said that he told Seller that Buyer did not owe interest because the note was not in existence at the time of the disbursement. Seller told him that the terms of the contract served as a note.

Sandra Bates, Buyer's real estate agent, related that Buyer desired to purchase the property through a 1031 exchange, which was a "tax free exchange of like properties, one for the other." She recalled that she was present when the contract was drafted and opined that the contract provided for a $500,000 down payment with an interest payment of 5 percent in one year. She admitted that a note for the property was never transcribed.

Jessie Beard testified that he managed the campgrounds in Townsend for Buyer and that he also maintained the property at issue in this case. Mr. Beard testified that in June 2007, Buyer asked him to take a check for $50,000 to Seller. He recalled that Seller refused the check and told him that the check was insufficient.

Spencer Davis, an environmental specialist for the State of Tennessee, Department of Environment and Conservation, Division of Water Supply, recalled that Seller contacted him about the property at issue in this case and told him that "he was concerned about liability to him if water was being served and had some potential contamination in it." Mr. Davis visited Seller's property in January 2008 to check the spring at Seller's request. Seller took him to the spring and the gallery building. Mr. Davis took a sample of the water from the gallery kitchen faucet. He opined that further tests needed to be done to approve the water supply as appropriate for the public. He related that E. coli was present in the water but admitted that he was unable to determine when the E. coli initially contaminated the water supply. He believed that if treated, the water could be appropriate for public consumption but that "[i]t would be more feasible to pursue an alternative source."

Following the presentation of Buyer's proof, Seller moved for an involuntary dismissal. Following argument by counsel, the court denied the motion without explanation.

Seller, who was 76 years old at the time of the trial, testified that he had lived on the property for approximately 40 years. He described the property as an approximately 125 acres of "rustic mountain country bordering the Great Smoky Mountains National Park." He and other employees built the gallery, the residence, and the out-buildings on the property. He decided to sell the property because he wanted to retire, and he met Buyer shortly after he listed the property. He recalled that Buyer's initial offer was unacceptable because Buyer wanted to set up a lease purchase agreement at an unacceptable interest rate.

Relative to the interest payment, Seller recalled that when he told Buyer they would meet again in a year to receive the interest payment, Buyer said, "Well, we'll need to talk about that." Seller wrote Buyer several letters about the interest payment but never received a response. In one such letter, he wrote, in pertinent part,

> Lines 301-307, of the Purchase and Sale Agreement, state that $125,000 will be due and payable on the anniversary of the note. Although you stated that this figure did not represent "interest," the agreement is very explicit in that it does indeed specify as 5% *Interest*. You have further suggested that, if you choose to exercise your right to an extension of the Closing Date the above amount will not be due until the arrival of the *extended* closing date. Since the $125,000 is indeed *interest*, it is treated separately from *principle* and as such, is due and payable on June 07, 2007. If for whatever reasons, this payment should be deferred until the arrival of the *extended* closing date, the interest rate, of 5% per annum will also apply to the accrued interest as well as the unpaid interest.

Seller testified that he refused the first option payment of $50,000 because "there was really no description of the purpose of it and no dates, so it was rather vague" and "unusual, especially since we already had some potential problems developing that we were needing to talk about." He felt that it would be "unwise" to accept the money without speaking with an attorney, and he believed "that the interest for the first year was due and should have accompanied that payment." When he returned to the property, he discovered that the property was "basically in a situation you would expect of a property being abandoned."

Seller stated that prior to closing, he received a letter from Buyer offering to pay the interest payment if Seller accepted a note on the property for the remaining amount. Seller was "astounded" by the letter because "[i]t was a completely new idea, and it was an idea that [he] had actually rejected early on before the closing was ever done initially." He was simply

"unwilling to carry a note." When he re-took possession of the property, he found that the property was still in disrepair. He said that he placed the property back on the market for 3 million dollars but was unable to sell the property.

Relative to the spring, Seller testified that it was a natural spring that he developed into a usable water source by "digging it out and putting in the necessary plumbing and pumps." He said that the spring was the only drinkable water source on the property but that the spring was not approved for public consumption. He admitted that he and his employees drank the water but stated that he offered visitors bottled water instead of water from the spring. He told Buyer that he "had been using the water ever since [he'd] been there, that [he] had no ill-effects from it, but that it was not approved." He had the water inspected and learned that there was "some natural bacteria that's found in almost all springs" but that "there was nothing found that was threatening to [his] health or well-being, and that was why the family not only allowed it, but they encouraged it." He recalled that he gave Buyer instructions regarding how to maintain the water source.

Boyce Lamar Snyder testified that she visited Seller's property in 2008 because she needed property for "a spiritual-type retreat." She did not purchase the property because her research indicated that there was a lien on the property.

Following the presentation of the proof, the trial court found Seller's credibility to be questionable given his testimony regarding the spring on the property and his representations to potential buyers. The court found that regardless of the credibility questions, Addendum F "clearly modified the terms of the purchase and sales agreement which called for a down payment of $500,000 and a note for 2.5 million bearing 5% interest." The court continued,

> This addendum clearly extends the closing date by providing [Buyer] with the possibility of two option periods from the payment of $50,000 for each option. There is no provision for interest in this addendum. The surrender of a note and interest is clearly established by the fact that [at the June 2007] closing wherein [Buyer] paid [Seller] $500,000 representing the non refundable down payment . . . no note was given or even discussed. The clear implication being that a note and interest were replaced with the two options that were granted [to Buyer]. [Seller's] insistence that [Buyer] pay interest . . . including the other provisions of the contract precipitated the failure of these parties to conclude the contract. Therefore[,] the [c]ourt finds that [Seller's] actions breached this contract.

The court denied the material misrepresentation claim because Buyer failed to prove "that the water supply was contaminated prior to his possession or the entering into the contract."

Relative to damages, the court found that the contract price and the fair market value of the property was 3 million dollars. The court stated,

> [T]he aim of damages for the breach of contract is to place the parties in the same situation they would have been in had the contract been performed. In this case, the [c]ourt finds that [Buyer] has already paid $500,000 as a down payment as well as $100,000 in other payments.
>
> [Buyer's] complaint, among other prayers for relief, included a claim for recision based upon mutual mistake. The [c]ourt has found that no mutual mistake existed that would justify recision. [Seller] breached the contract and received the $500,000 non-refundable payment as well as $100,000 in option payments. Clearly, the provision for the $500,000 non-refundable payment was in the event [Buyer] did not fulfill the contract. However, [Buyer] was ready to perform absent [Seller's] breach. Consequently, [Buyer] is entitled to $600,000 in damages plus interest at the rate of 10% to be determined as of the date of the filing of the lawsuit. The agreement also provides for reasonable attorney fees.

The court subsequently awarded $42,353.75 in attorney fees, $2,536 in discretionary costs, and $923 in contractual costs. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Seller as follows:

A. Whether the trial court erred in denying the motion to dismiss following Buyer's presentation of the proof.

B. Whether the trial court erred in ruling that Seller breached the contract.

C. Whether the trial court erred in calculating the amount of damages.

Buyer raised the following issue for our consideration:

D. Whether Buyer is entitled to attorney fees and costs on appeal.

# III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

The trial court's award of damages and award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

# IV. DISCUSSION

## A. & B.

Seller asserts that the trial court erred in denying the motion for involuntary dismissal because Buyer failed to "introduce proof to establish any damages to which [Buyer] was entitled." Seller also asserts that the trial court erred in ruling that he breached the contract. Seller contends that Buyer breached the contract by failing to remit the interest payment as provided in the contract and by insisting that Seller carry a note for the remainder of the purchase price.

The Tennessee Rules of Civil Procedure provide for involuntary dismissal as follows:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown

-11-

no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusion of law and direct the entry of the appropriate judgment.

Tenn. R. Civ. P. 41.02(2). "When a motion to dismiss is made at the close of plaintiff's proof in a nonjury case, the trial court evaluates the case in the same manner as though the trial court were making findings of fact at the conclusion of all evidence for both parties." *Cole v. Clifton*, 833 S.W.2d 75, 77 (Tenn. Ct. App. 1992) (citing *City of Columbia v. C.F.W. Const. Co.*, 557 S.W.2d 734, 740 (Tenn. 1977)). If the plaintiff failed to prove his or her case "by a preponderance of the evidence, the trial court may render a judgment on the merits for [the] defendant." *Id.* (citing *Brewer v. Haynes*, 681 S.W.2d 551, 552 (Tenn. Ct. App. 1984)). On appeal, the court's decision is subject to a de novo review, "with a presumption of the correctness of the judgment unless the preponderance of the evidence is otherwise." *Id.* The court's decision is subject to a de novo review with no presumption of correctness if the court failed to make findings of fact on the record. *Kesterson v. Varner*, 172 S.W.3d 556, 566 (Tenn. Ct. App. 2005).

Among other claims for relief, Buyer alleged that Seller breached the contract and that he was entitled to damages. In order to prevail in a breach of contract case, Buyer had to prove that an enforceable contract existed between the parties. *See Seramur v. Life Care Ctrs. of Am. Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *2 (Tenn. Ct. App. Apr. 2, 2009) (citing *Hatchel*, 223 S.W.3d at 227). The parties did not dispute that an enforceable contract existed. Thus, Buyer only needed to prove that Seller breached the contract and that he was entitled to damages. *Hatchel*, 223 S.W.3d at 227.

The interpretation of written agreements is a matter of law, which this court reviews de novo without a presumption of correctness. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). The court's initial task in construing the contract is to determine whether the language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). A contract is ambiguous if its meaning is uncertain and is susceptible to more than one reasonable interpretation. *See Bonastia v. Berman Bros.*, 914 F.Supp. 1533, 1537 (W.D.

Tenn. 1995); *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. Ct. App.1995); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). If we determine that the language of a contract is ambiguous, we construe the ambiguity against the drafter of the contract. *See Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

Nevertheless, if the language in a contract is plain and unambiguous, courts then "determine the parties' intention from the four corners of the contract, interpreting and enforcing [the contract] as written." *Union Realty Co., Ltd. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007) (citing *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000)). If the language is clear and unambiguous, "the literal interpretation of the language controls the outcome of the contract disputes." *Planters Gin Co.*, 78 S.W.3d at 890. We construe all provisions of a contract in harmony with each other, "if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App.1992).

This contract was clear and unambiguous. A straightforward reading of the contract reveals that Addendum F significantly modified the terms of the contract. The contract originally provided that a note was to be held for one year following the remittance of a $500,000 down payment on the closing date, May 15, 2006. The note was to bear interest at a rate of 5 percent, and the interest payment would be due on the anniversary of the note. Addendum E extended the closing date to June 6, 2006, while Addendum F allowed Buyer to extend the closing date until June 1, 2008. When the parties signed the contract in 2006, Buyer remitted the down payment to obtain possession. A note was never signed because Addendum F removed the necessity for Seller to carry a note for the remainder of the purchase price. Instead, Buyer was allowed to extend the closing date by remitting two optional payments of $50,000. Seller breached the contract by demanding interest when Buyer attempted to exercise his first option to extend the closing date. Buyer offered to continue with the transaction by having Seller carry a note for the purchase price following closing; however, Seller rejected the offer.

Buyer asserted that he was entitled to damages in the amount of 3 million dollars. It is well settled that "[t]he party seeking damages has the burden of proving them." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004). "Damages may never be based on mere conjecture or speculation." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). "Uncertain, contingent, or speculative damages should not be awarded." *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 336 (Tenn. Ct. App. 1987) (quoting *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551 (Tenn. Ct.

App. 1985)). An award for damages "requires proof of damages within a reasonable degree of certainty." *Id.* at 336 (citing *Wilson v. Farmers Chem. Ass'n*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969)). "'The law does not require exactness of computation in suits that involve a question of damages growing out of contract or tort.'" *Hatchel*, 223 S.W.3d at 230 (quoting *St. John v. Bratton*, 150 S.W.2d 727, 729 (Tenn. Ct. App. 1941)).

"The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). "The injured party is not entitled to profit from the defendant's breach." *Hatchel*, 223 S.W.3d at 228. In real estate transactions, damages are assessed by awarding the non-breaching party with "'the difference between the contract price and the fair market value of the property at the time of the breach.'" *Id.* (quoting *Turner v. Benson*, 672 S.W.2d 752, 754 (Tenn. 1984)).

Buyer failed to prove that he was entitled to 3 million dollars in damages and did not present any testimony regarding the fair market value of the property prior to Seller's motion for involuntary dismissal. However, Buyer presented proof "that would enable the trial court to establish [] damages within a reasonable degree of certainty." *Id.* at 230. Indeed, "[d]amages for breach of contract are permissible even when the plaintiff is unable to prove the exact amount of those damages." *Id.* (citing *Provident Life & Accident Ins. Co. v. Globe Indemnity Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928)). Like the trial court, we believe that Buyer was at least entitled to the return of his down payment and the extension payments following Seller's breach of the contract in order to place him in the same position he would have been in if Seller had not breached the contract. Accordingly, we conclude that the trial court did not err in denying the motion for involuntary dismissal because Buyer proved that he was entitled to recover for Seller's breach of the contract. We also conclude that Seller's insistence upon interest was the first material breach of the contract. Therefore, we hold that Buyer's subsequent insistence that Seller carry a note on the property did not preclude his recovery. *See McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) ("A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract.").

## C.

### 1.

Seller asserts that the return of the $500,000 was "effectively a recision measure of damages for which [Buyer] did not plead or otherwise offer proof at trial." Buyer responds

that the court did not rescind the contract but merely awarded damages to make him "whole based on monies actually tendered to [Seller]."

Here, the court specifically found that the contract price and the fair market value of the property at the time of the breach was the same. Accordingly, the usual measure of damages relevant to real estate transactions was inappropriate. As stated previously, we believe that the return of the payments made to Seller was appropriate to place Buyer in the same position he would have been in if Seller had not breached the contract.

2.

Seller contends that the trial court erred in ruling that Buyer was entitled to reimbursement for the $50,000 optional extension payments. Seller notes that the parties did not intend to apply the $50,000 payments toward the purchase price but that these payments were made to extend the closing date. Seller argues that Buyer received the benefit of these payments because the closing date was extended pursuant to the agreement.

We acknowledge that the payments were meant to be non-refundable. However, as stated previously, the return of the payments was appropriate to place Buyer in the same position he would have been in if Seller had not breached the contract.

3.

Seller contends that he was entitled to compensation from the Buyer for use of the property because the trial court effectively rescinded the contract. Seller asserts that the $500,000 down payment represented the fair market rental value of the property because that is the sum Buyer paid to obtain possession of the property.

We acknowledge that a seller is generally entitled to compensation for a buyer's use of real estate if the trial court rescinds the contract. *Harrison v. Laursen*, No. 01-A-019204CV00177, 1992 WL 301309, at *2 (Tenn. Ct. App. 1992). However, as mentioned previously, the trial court did not rescind the contract but merely attempted to place Buyer in the same position he would have been in had the contract been performed. This issue is without merit.

4.

Seller asserts that the trial court abused its discretion by awarding Buyer prejudgment interest for the period prior to the date of any alleged breach. Buyer maintains that the award of prejudgment interest was appropriate.

In its subsequent judgment, the court ruled that interest should accrue on the $500,000 payment from and after June 25, 2007, the date Buyer filed the complaint. The court also ruled that interest should accrue on the two $50,000 payments from and after July 18, 2007, two days after Buyer made the first payment, and from and after January 18, 2008, the date Buyer made the second payment.

The trial court may award prejudgment interest "as an element of, or in the nature of, damages . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123. "The usual means of compensating for [loss of use of funds] is the allowance of interest. Interest recovered in order to make the obligee whole is the relief usually sought, and the allowance of prejudgment interest under such circumstances is 'familiar and almost commonplace.'" *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994) (quoting *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989)). "The purpose of pre-judgment interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005) (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)).

In determining whether to award pre-judgment interest courts should consider the principles of equity and two additional factors. *Mitchell*, 876 S.W.2d at 830. First, an award of interest is allowed when "the amount of the obligation is certain" or reasonably ascertainable "by a proper accounting" and "is not disputed on reasonable grounds." *Myint*, 970 S.W.2d at 927. Second, an award of interest is allowed when "the existence of the obligation itself is not disputed on reasonable grounds." *Id.* However, "[t]he uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable." *Id.* at 928.

Here, the amount of the obligation was certain, and the award of interest was equitable because Buyer lost the use of the payments while the case progressed in litigation. Moreover, the court's decision to award prejudgment interest was wholly within the court's discretion. *See* Tenn. Code Ann. § 47-14-123. Following our review, we conclude that the trial court did not abuse its discretion in awarding prejudgment interest.

D.

Buyer asserts that he is entitled to additional attorney fees and costs on appeal. Tennessee Code Annotated section 27-1-122 provides for an award of damages, including attorney fees, when an appeal is determined to be frivolous. To find an appeal frivolous, the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins.*

*Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Inds. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995).  An appellate court's decision on this issue is discretionary, and this court is generally reluctant to award such damages because we do not want to discourage legitimate appeals. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006).  We respectfully deny Buyer's request for attorney fees on appeal in this case because Seller's appeal was not wholly devoid of merit.

## V.  CONCLUSION

The judgment of the circuit court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Lee Roy Roberson, Jr.


_____
JOHN W. McCLARTY, JUDGE

-17-